IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AVERY B.,[1]                                                    Case No. 3:22-cv-00271-JR

          Plaintiff,                                      OPINION AND ORDER

          v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

          Defendant.

RUSSO, Magistrate Judge:

      Plaintiff Avery B. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying their applications for Title II Disability Insurance Benefits and Title XVI Social Security Income under the Social Security Act. All parties have consented to allow a Magistrate Judge enter final orders and judgement in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded for further proceedings.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

## PROCEDURAL BACKGROUND

Born in July 1995, plaintiff alleges disability beginning October 1, 2019,[2] due to psychosis, anxiety, depression, post-traumatic stress disorder ("PTSD"), and imbalance issues. Tr. 507, 519. Their applications were denied initially and upon reconsideration. On August 31, 2021, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did a vocational expert ("VE"). Tr. 315-37. On September 15, 2021, the ALJ issued a decision finding plaintiff not disabled. Tr. 286-301. After the Appeals Council denied their request for review, plaintiff filed a complaint in this Court. Tr. 1-6.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity since the amended alleged onset date. Tr. 288. At step two, the ALJ determined the following impairments were medically determinable and severe: "an eating disorder with weight loss[,] a history of occasional non epileptic seizures, anxiety, depression, and PTSD." Tr. 289. At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 290.

Because they did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected their ability to work. The ALJ resolved that plaintiff had the residual function capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and 20 C.F.R. § 416.967(b) except they "would need to avoid climbing ropes, ladders, or scaffolds" and "concentrated exposure to temperature extremes, unprotected heights, moving

---

[2] Plaintiff initially alleged disability as of May 1, 2019, but amended the onset date at the hearing to correspond to the "when . . . he began to scale down his work." Tr. 286, 320.

machinery and similar hazards," and are "further limited to simple, repetitive, routine tasks with no more than occasional contact with co-workers and the general public." Tr. 292.

At step four, the ALJ determined plaintiff was unable to perform any past relevant work. Tr. 299. At step five, the ALJ concluded, based on the VE's testimony, that there existed a significant number of jobs in the national economy plaintiff could perform despite their impairments, such as basket filler, egg sorter, and garment sorter. Tr. 300.

## DISCUSSION

Plaintiff argues the ALJ erred by: (1) discrediting their subjective symptom statements; and (2) improperly assessing the opinions of examining Doctor Linda Fishman, Ph.D., and treating Doctor Neil Falk, M.D.[3]

## I.    Plaintiff's Testimony

Plaintiff contends the ALJ erred by discrediting their testimony concerning the extent of their impairments. When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (internal citation omitted). A general assertion the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the

_____

[3] Plaintiff additionally contends that Listings 12.04 and 12.13 are met (based on the opinions of Drs. Fishman and Falk, which should be credited as true), and a finding of presumptive disability is warranted at step three. This contingent argument is therefore more appropriately addressed in the context of determining the proper legal remedy.

reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted).

Thus, in formulating the RFC, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness, and instead assesses whether the claimant's subjective symptom statements are consistent with the record as a whole. SSR 16-3p, *available at* 2016 WL 1119029. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted).

At the hearing, plaintiff testified they were unable to work due to the "rapid deterioration of my mental health since" October 2019. Tr. 321, 324. Plaintiff explained that they had been working as a dog trainer and "had to scale back . . . until February of 2020 when I stopped working entirely." *Id.* Between October 2019 and February 2020, plaintiff reported seeing "three to four clients a week," which entailed driving to the dog owner's house and "either train[ing] their dog by itself or I would train the client along with the dog to solve any behavioral problems that they had." Tr. 322. Plaintiff also reported attending Portland Community College during the end of 2019 and first half of 2020. Tr. 322-23. They took three classes during the Winter 2019 term – passing one class and getting "a D and an F in the other classes," even with accommodations – and then took one class in each of the two subsequent terms. Tr. 323. Plaintiff ultimately stopped enrolling in classes because, during the "summer of 2020, I experienced a mental breakdown that caused a hospitalization." Tr. 324.

As far as treatment, plaintiff reported they have been diligently attending individual therapy twice per week and group therapy once per week, which "helped some, but it still has not gotten me to the place that I want to be." Tr. 324-25, 336. Additionally, plaintiff stated they have "tried

nine different anti-depressant medications and I'm really, really, really trying to get better." Tr. 336.

In terms of daily activities, plaintiff endorsed driving five or six times per month (but they only leave the house on "essential trips" due to anxiety) and going online to email and do research (although they "can't really focus on [reading] for longer than 5 minutes"). Tr. 325-26. Plaintiff also endorsed "good days and bad days." *Id.* On good days, plaintiff spends "about 50 to 60% of my time in bed, and the rest of the time I'm up and doing small tasks -- a little bit of cleaning, possibly cooking." *Id.* On bad days, plaintiff spends "up to about 80 to 90% of my day in bed." Tr. 326.

After summarizing their hearing testimony, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce some degree of symptoms, but their "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 293. In particular, the ALJ cited plaintiff's daily activities and the lack of medical evidence indicative of additional limitations. Tr. 293-96.

The ALJ's reasons are legally sufficient and supported by substantial evidence, but only as to the period that predates March 2020.[4] Critically, evidence from October 2019 through February 2020 evinces a level of daily functioning in excess of plaintiff's subjective symptoms statements. *See Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) ("[e]ven where [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment") (citations omitted).

---

[4] Significantly, the Commissioner's brief does not specifically reference plaintiff's mental health testimony (which forms the basis of this appeal). *See* Def.'s Resp. Br. 2-3 (doc. 32) (solely addressing plaintiff's use of a walker, non-epileptic seizures, and daily activities).

At the hearing, plaintiff acknowledged their dog training and academic activities during this timeframe but indicated they collectively comprised fewer than ten hours per week. Tr. 322-24.

Yet the Disability Report completed in conjunction with plaintiff's applications reveals they worked as a pet trainer five hours per day, four days per week, through December 2019. Tr. 521. Plaintiff's contemporaneous statements to medical providers also demonstrate that they worked well beyond ten hours per week through February 2020. For instance, an August 2020 chart note documents that plaintiff "was working full-time, training dogs and last worked in 02/2020." A medical form from February 2020 shows plaintiff spent approximately 30 hours per week between school and dog training – i.e., 13 hours per week in classes, 7 hours per week reading and studying, and up to 10 hours per week working. Tr. 710. Also in February 2020, plaintiff reported going outside daily, driving, attending an autism support group, engaging in regular cooking and meal preparation, cleaning with breaks to account for fatigue, and spending about three hours each morning "sending emails, watching YouTube, and mentally preparing for the day." Tr. 717. At that time, plaintiff still had two dog training clients that they "keep [on to help] pay for basic necessities." Tr. 718.

The record reflects, however, that plaintiff's mental health symptoms increased thereafter. By March 2020, plaintiff had "transferred his clients at work to another trainer," citing "ongoing challenges related to the social aspects of the job." Tr. 1196. Around that time, plaintiff began disengaging from school, "reduc[ing] their school load to 1 class." *See, e.g.*, Tr. 1180, 1189, 1210, 1560. Although they occasionally experienced brief improvements in mood or energy, plaintiff was nonetheless struggling with paranoia, hallucinations, suicidal ideation, and food. Tr. 1165-95, 1201-15; *see also* Tr. 1222 (chart note evincing that plaintiff's "eating struggles . . . worsened in 03/2020"), 1502 (chart note demonstrating plaintiff "experienced an increase in mental health

symptoms in the spring of 2020 [and they] stopped working, and stopped most forms of self-care including eating").

In July 2020, plaintiff presented to the emergency department twice due to generalized weakness and because "he thinks he is having a psychotic episode . . . he has been shaking and this may be 'an extreme anxiety attack.'" Tr. 1535-59. Plaintiff was discharged with "probable anxiety" and instructed to follow-up with their treating mental health providers. Tr. 1537, 1550. Between August and November 2020, plaintiff participated in an in-patient eating disorder program through Providence St. Vincent Hospital. *See, e.g.*, Tr. 1200, 1216-1408, 1752-1946. These chart notes reflect plaintiff struggling with program engagement, eating, and emotions. While plaintiff's weight stabilized for a period thereafter, they continued to experience low energy, depression, and anxiety, ultimately seeking care from the emergency department in September 2021 and subsequently enrolling in an intensive out-patient program for suicidal ideation (shortly after the ALJ hearing). Tr. 112-18, 171-76, 190-220, 228-32, 235-51, 256-66, 311-13, 1457-74, 1487-1512, 1686-1712, 1715-36, 1746-52.

The ALJ wholly failed to distinguish between these two time periods and instead exclusively relied on inconsistencies in the record that coincided with plaintiff's period of increased activity during the beginning of the adjudication period to discredit their hearing testimony. *See* Tr. 296 (ALJ citing daily activities from no later than "Spring 2020"). This is problematic given there is no dispute plaintiff suffers from longstanding and significant psychological conditions. *See* Tr. 293-95 (ALJ acknowledging plaintiff's participation in an in-treatment eating disorder program in October 2020 and accepting objective medical evidence of their abnormal psychological clinical findings). Stated differently, although the precise confines of plaintiff's functional limitations after February 2020 are not well-defined in the record before

the Court, it is nonetheless clear that plaintiff could not have performed work consistent with the RFC during this time period.

Therefore, the record is insufficient to support the ALJ's decision as to this issue. *Cf. Robbins v. Social Sec. Admin.*, 466 F.3d 880, 884 n.2 (9th Cir. 2006) (reversing the ALJ's credibility finding where he neglected to account for or otherwise "investigate the possible disparity" between the claimant's inconsistent reports of alcohol use); *Lee v. Colvin*, 2016 WL 3647974, *2-5 (D. Or. July 7, 2016) (reversing the ALJ's decision where the record demonstrated that the claimant's back condition was not disabling as of the alleged onset date but was nonetheless "gradually deteriorating and may have become more extreme prior to the established disability date").

Turning to the ALJ's remaining rationale, "whether the alleged symptoms are consistent with the medical evidence" is a relevant consideration, but "an ALJ cannot reject a claimant's subjective pain or symptom testimony simply because the alleged severity of the pain or symptoms is not supported by objective medical evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007) (citations omitted). That is, the ALJ may not rely exclusively on the lack of corroborating medical evidence to discount a claimant's hearing testimony where, as here, the ALJ's other reasons for finding that testimony unreliable are not supported by substantial evidence. *See Brown v. Colvin*, 2014 WL 6388540, *5-6 (D. Or. Nov. 13, 2014) (reversing the ALJ's credibility finding where the only rationale supported by substantial evidence was inconsistency with the medical record).

In any event, the ALJ mischaracterized the record in recounting the medical evidence. *See Reddick v. Chater*, 157 F.3d 715, 722-23 (9th Cir. 1998) (ALJ's "paraphrasing of record material" was "not entirely accurate regarding the content and tone of the record" and did not support an

adverse credibility finding). Notably, the routine examination findings cited by the ALJ – e.g., intact attention, concentration, and memory; appropriate eye contact; normal mood and affect; organized thought processes; etc. – have no bearing on and therefore do not undermine plaintiff's subjective symptom testimony concerning their depression and anxiety. Tr. 18. This is especially true considering there are a number of medical records evincing plaintiff struggled with symptoms during appointments and treatment programs. *See* Tr. 1179 (plaintiff observed by a medical provider "sounding tired, low energy"), 1180 ("[a]s conversation progressed [plaintiff] became more and more tearful"), 1182 (plaintiff "reports that he 'had a rough night' the previous evening and was continuing to cry"); *see also* Tr. 294 (ALJ noting that plaintiff often appeared anxious or depressed upon exam). And, as discussed in Section II, the ALJ failed to meaningfully engage with the only treating medical opinion in the record before the Court.

In sum, the ALJ neglected to provide a clear and convincing reason, supported by substantial evidence, for affording less weight to plaintiff's subjective symptom testimony. The ALJ's decision is reversed as to this issue.

## II.    Medical Opinion Evidence

Plaintiff next asserts the ALJ improperly discredited the opinion of Drs. Fishman and Falk. Where, as here, the plaintiff's application is filed on or after March 27, 2017, the ALJ is no longer tasked with "weighing" medical opinions, but rather must determine which are most "persuasive." 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(b).  "To that end, there is no longer any inherent extra weight given to the opinions of treating physicians . . . the ALJ considers the 'supportability' and 'consistency' of the opinions, followed by additional sub-factors, in determining how persuasive

the opinions are."[5] *Kevin R. H. v. Saul*, 2021 WL 4330860, *4 (D. Or. Sept. 23, 2021). The ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" and "explain how [they] considered the supportability and consistency factors." *Id.* At a minimum, "this appears to necessitate that an ALJ specifically account for the legitimate factors of supportability and consistency in addressing the persuasiveness of a medical opinion." *Id.*

A.    **Dr. Fishman**

In February 2020, Dr. Fishman completed a learning assessment to develop academic recommendations associated with plaintiff's community college courses. Tr. 700. Her exam consisted of a clinical interview, mental status exam, and objective testing. Tr. 700-08. Plaintiff's intellectual and academic test scores ranged from low average to superior. Tr. 703-05, 707-08. While these tests revealed areas of relative strength, plaintiff also demonstrated some deficits in verbal/auditory ability, math fluency, and processing speed. *Id.*

Plaintiff's attention and executive functioning test scores showed severe impairment with moving easily from one thought, situation, activity, or aspect of a problem to another; emotional responses; mental control and problem solving; and setting realistic goals, planning steps to complete complex activities necessary to meet these future goals, accurately estimating the time needed, and starting in a timely fashion. Tr. 706.

Dr. Fishman diagnosed plaintiff with Attention Deficit/Hyperactivity Disorder and Learning Disorder with Impairments in Mathematics; she also listed Psychotic Disorder and

---

[5] As the Ninth Circuit recently explained, "[u]nder the revised regulations . . . a medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). The new regulations nonetheless "displace our longstanding case law requiring an ALJ to provide" different levels of reasoning (i.e., "clear and convincing" or "specific and legitimate") based on a hierarchy of medical sources. *Id.* at 787.

Autism Spectrum Disorder "per client report." Tr. 708. In the narrative portion of her report, Dr.

Fishman recognized plaintiff's cognitive and achievement abilities, but denoted that their "current

results" nonetheless "identify the presence of several interferences to overall functioning that are

likely to cause academic problems for him, including a thought disorder, sensory sensitivities,

[slow processing speed,] and attentional problems." Tr. 708. The doctor then listed a number of

representative "recommendations for Avery's constellation of difficulties," such as "[t]esting in a

distraction-reduced environment away from the classroom, to reduce the interference of Avery's

distractibility on his academic performance"; "[e]xtended time in test taking conditions, to time

and a half the standard testing time allotted, to reduce or eliminate the effects of Avery's

distractibility, auditory/verbal memory weaknesses, and slow cognitive processing speed on his

academic performance"; "[o]ral administration of tests, permitting Avery to demonstrate his

knowledge with less interference from his attentional disorder and slow processing speed"; and

"[n]o loss of grade points for absence from classes due to psychiatric symptoms." Tr. 708-09.

     The ALJ found Dr. Fishman's "psychoeducational evaluation and associated

recommendations . . . not persuasive," explaining:

> Dr. Fishman opined that the claimant's cognitive abilities were generally within the
> average range, but noted attentional problems and slow professing speed, and
> recommended multiple academic accommodations (including distraction free
> testing and extended test taking time). While supported by an examination, and
> while the average cognitive functioning with attentional problems and slow
> processing speed is consistent with the record, including the claimant's often
> normal memory and attention, Dr. Fishman's assessment is not supported by an
> explanation of the claimant's functional capacity.

Tr. 297.

     The ALJ's rationale for rejecting Dr. Fishman's report is improper when that report is read

in its entirety and given its proper context. Dr. Fishman independently examined plaintiff and

administered a number of objective tests which were indicative of certain limitations that were

well-articulated within her assessment. She observed that plaintiff "was persistent and appeared motivated to complete testing, exerting adequate effort and attempting all tasks presented to him," such that "the results of the evaluation provide a valid representation of Avery's current level of cognitive and academic functioning." Tr. 703. Although phrased for an academic setting, many of the assessed limitations are directly relevant to a work environment (e.g., the need for additional time/breaks and increased absences), consistent with other evidence of record, and not adequately captured by the ALJ's RFC. Thus, the ALJ erred as to Dr. Fishman.

**B.    Dr. Falk**

Dr. Falk began providing mental health services to plaintiff in April 2019 through Multnomah Early Assessment and Support Alliance ("EASA"), a 2-year outreach and treatment program for young people with early symptoms of psychosis. Tr. 1092. In June 2021, shortly after plaintiff had graduated from that program and transitioned care to another provider, Dr. Falk completed a "Mental Residual Functional Capacity Assessment" at the request of plaintiff's counsel. Tr. 1513-15. Dr. Falk listed plaintiff's diagnoses as "ADHD, PTSD, Major Depressive Disorder, Avoidant Restrictive Food Intake Disorder, Learning Disorder (Math), provisional diagnoses of Mild Autism Spectrum Disorder." Tr. 1513. As a result of these impairments, Dr. Falk opined plaintiff would need extra breaks and miss more than two days per month "from even a simple and routine job." Tr. 1514-15.

Additionally, Dr. Falk endorsed "marked" or "extreme" limitations in plaintiff's ability to: interact appropriately with the general public or customers; understand and respond to social cues; respond to requests, suggestions, criticism, correction, and challenges from supervisors; and work cooperatively and handle conflicts with coworkers. Tr. 1514. Dr. Falk explained that these

limitations stemmed from plaintiff's "difficulty interacting with those not known well," which will cause them to "voice agreement/understanding but have difficulty following through." *Id.*

And he endorsed moderate limitations in plaintiff's ability to: respond to demands and adapt to changes; manage psychologically based symptoms; work at an appropriate pace and complete tasks in a timely manner; ignore or avoid distractions while working, and work close to or with others without interrupting or distracting them; change activities or work settings without being disruptive; and use reason and judgment to make work-related decisions. Tr. 1514-15. In the narrative portion, Dr. Falk noted that plaintiff had certain relative strengths – i.e., "good memory + problem solving skills" and "adapt[ing] to change, including change in severity in symptoms" – but would nonetheless struggle due to "low energy, leading to difficulty completing tasks + sustaining routine" and their tendency to "get overwhelmed in complex situations." *Id.*

The ALJ determined Dr. Falk's opinion was "not persuasive." Tr. 297. In particular, the ALJ resolved that Dr. Falk's significant limitations were inconsistent both internally and with the medical record, as well as with plaintiff's "testimony that he is always on time and punctual for treatment." Tr. 297-98. The ALJ also found that "Dr. Falk's treatment records do not support the opined severity," noting instances where Dr. Falk "recorded normal grooming, psychomotor activity, thought organization, and speech, and mild depression and anxiety." Tr. 297.

An independent review of the record reveals that the ALJ's consideration of the supportability and consistency of Dr. Falk's opinions, along with the additional sub-factors, is not supported by substantial evidence. As an initial matter, there are no internal inconsistencies in Dr. Falk's report. That fact that he noted plaintiff's strengths and weakness (which, in turn, would lead to restriction in some areas but not others) is not a valid basis to discredit his opinion. Similarly, the fact that plaintiff is diligent in pursuing treatment (largely remotely due to the Covid-19

pandemic) does not speak to their ability to manage their symptoms on a consistent basis outside the home given the tone and content of the record before the Court.

Moreover, while Dr. Falk's treatment records from around the amended alleged onset date document increased daily activities, decent sleep, and situational depression, the few that exist after February 2020 reflect persistent anxiety and depression (and accompanying insomnia), even once plaintiff's weight stabilized following discharge from the eating disorder program. *Compare* Tr. 591-604, *with* Tr. 1191, 1457-58, 1461-62, 1465-66, 1469-72, 1479-80. Records from other members of the EASA treatment team, some of which are addressed in Section I, demonstrate that plaintiff's symptoms increased in March 2020. In other words, the overall medical record does not contravene Dr. Falk's opinion to the extent it evinces a significant disruption to plaintiff's functioning due to an increase in mental symptoms after February 2020.

Therefore, the ALJ committed reversible error in regard to the opinions of Drs. Fishman and Falk. *See Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (only mistakes that are "non-prejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion" are harmless).

**III.    Remedy**

The decision whether to remand for further proceedings or for the immediate payment of benefits lies within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1176-78 (9th Cir. 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1090-1100 (9th Cir. 2014). The court may not award benefits punitively and must conduct a "credit-as-true"

analysis on evidence that has been improperly rejected by the ALJ to determine if a claimant is disabled. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011); *see also Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015) (summarizing the standard for determining the proper remedy).

As discussed herein, the ALJ committed harmful legal error by failing to properly evaluate evidence from plaintiff and Drs. Fishman and Falk. Further proceedings would nonetheless be useful regarding the extent of plaintiff's allegedly disabling mental impairments, such that crediting the opinions of Drs. Fishman and Falk as true and/or remanding for the immediate payment of benefits (either under a listing or otherwise) is improper.

On one hand, it is undisputed that plaintiff's depression and anxiety are longstanding, and have persisted at significant levels since March 2020, despite regular and continuing treatment. On the other hand, plaintiff frequently went off their medications and hormones, which exacerbated their symptoms, and the most recent chart notes from November 2021 show improvement with consistent food intake and Ketamine infusions. *See, e.g.*, Tr. 41. Accordingly, the record is ambiguous concerning if/when plaintiff's mental impairments became disabling.

Further, while the ALJ inadequately addressed the persuasiveness of Dr. Fishman's opinion, some of her conclusions are not phrased as concrete work-related limitations of function. Likewise, Dr. Falk's opinion does not address plaintiff's functioning after they ceased treatment with EASA in early 2021, such that there is no opinion evidence surrounding plaintiff's most recent increase in symptoms and the overall cyclical nature of their impairments.

As such, further proceedings are required to resolve this case. *See Treichler*, 775 F.3d at 1099 (except in "rare circumstances," the proper remedy upon a finding of harmful error is to remand for further administrative proceedings). Given the ambiguity surrounding any potential

disability onset date, coupled with the complex and longstanding nature of plaintiff's mental health conditions, the use of a medical expert specializing in psychology would be helpful. Therefore, upon remand, the ALJ must consult a medical expert to review the entire record and opine as to plaintiff's functional abilities during 2020 and 2021 (and 2022 to the extent relevant based on any recent medical files) and, if necessary, reweigh the medical and other evidence of record, reformulate plaintiff's RFC, and obtain additional VE testimony.

## CONCLUSION

For the reasons stated above, the Commissioner's decision is REVERSED, and this case is REMANDED for further proceedings.

IT IS SO ORDERED.

DATED this 30th day of December, 2022.


_____
/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge